7 F.3d 226
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
BAXTER B. BENSON, II, Defendant-Appellee.
 No. 93-5204.
 United States Court of Appeals,
Fourth Circuit.
 Argued: July 16, 1993.
Decided: September 30, 1993.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.
 ARGUED: David J. Cortes, Assistant United States Attorney, for Appellant.
 Joseph Blount Cheshire, V, Cheshire, Parker & Manning, for Appellee.
 ON BRIEF: James R. Dedrick, United States Attorney, for Appellant.
 Richard Noel Gusler, Susan Waters, Law Student, Cheshire, Parker & Manning, for Appellee.
 E.D.N.C.
 REVERSED
 Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 The present case is a direct appeal by the United States from a sentence imposed pursuant to the Sentencing Guidelines upon Baxter Benson, II, who had entered a guilty plea to four counts of bank fraud. The government contests the district court's decision to depart downward from the eighteen to twenty-four months Guidelines range and impose instead a sentence of six months home detention based on a finding that Benson suffered from diminished capacity within the meaning of U.S.S.G. § 5K2.13.
 
 
 2
 At the time of the bank fraud, Benson was a self-employed real estate management agent in Raleigh, North Carolina. During a sixteen-month period beginning on December 18, 1989, he executed a scheme to defraud several banks, including Central Carolina Bank (CCB), Unity Bank, United Carolina Bank (UCB), and National Bank of North Carolina (NCNB, now known as Nationsbank), by submitting false and fraudulent financial statements as part of his loan applications. He thereby obtained thirteen loans totalling more than four million dollars from the four banks.
 
 
 3
 On February 28, 1991-approximately fourteen months after he first began his scheme-Benson went for an initial examination by Dr. Barringer, a psychiatrist. Dr. Barringer diagnosed Benson as suffering from depression and noted in his report from Benson's March 17, 1991 visit that Benson was "beginning to improve with antidepressants." Four days after that visit to Dr. Barringer, Benson borrowed $75,000 from CCB by submitting a financial statement which omitted debts totalling $4,062,000. On March 25, Benson's medical records showed: "Overall feeling better";"Panic attacks have gone." A week later, Benson obtained another fraudulent loan from CCB, for $10,000. The total amount of debt he failed to disclose was more than $4,000,000. That same day, April 2, 1991, Benson's medical record noted: "He now realizes he is going to have to file bankruptcy."
 
 
 4
 Mrs. Taylor, Benson's personal secretary since 1985, indicated that Benson appeared normal from the time she began working for him until about January 1991, when she noticed a change in his behavior, which became much more severe in March or April 1991. In early April, Benson was admitted to Raleigh Community Hospital. Shortly thereafter, on April 17, 1991, Benson perfected another fraudulent loan from Unity Bank for $25,000. The debts he failed to disclose totalled more than $4,000,000.
 
 
 5
 On May 7, 1991, Benson was discharged from Raleigh Community Hospital. His discharge summary described the main cause of hospitalization as "severe symptoms of stress secondary to extraordinary catastrophe in business." On May 22, 1991, he was admitted to Duke University Medical Center to see Dr. Roy Mathew, a psychiatrist. That day there appeared the following entry in Benson's medical record: "Patient reports that bankruptcy procedures and IRS investigation in the past year have led to depression." The diagnosis was anxiety related to "situational crisis (bankruptcy)." The psychiatric admission nurse, in her assessment of Benson's mental capacity, indicated that he did not suffer from a diminished ability to think, concentrate, or remember, that he was not disoriented or confused, and that he did not reveal disorganized thoughts or psychotic symptoms.
 
 
 6
 Shortly after admission to Duke Medical Center, Benson underwent a neurobehavioral cognitive status exam. It showed him to be "entirely within normal limits for all higher cortical functions assessed," i.e., "level of consciousness, orientation, attention, comprehension of language, repetition, naming, construction, memory, calculation, abstract reasoning, and practical problem-solving abilities."
 
 
 7
 A medical note entered the next day, May 24, showed that Benson was "addressing issues of grief over financial loss." There was further reiteration of this on May 29, 1991, when the medical record noted that "Pt reports significant # 73# in mood, # BF# in anxiety[with] major stressor of # 73# in business that Pt owns, probable bankruptcy." An entry in Benson's record on May 30, 1991 states that "Pt. traces the onset of his difficulties back to around 1/91, when his business began to have difficulties."
 
 
 8
 Benson was discharged from Duke on June 6, 1991. A medical record entry from his "Psychiatric Discharge Note," signed by Dr.
 
 
 9
 Mathew, noted that "[t]his is the second psychiatric hospitalization for [Benson] ... who presents with the chief complaint of extreme stress, duration three months." The record continued:"Due to the recent economic climate and a reported lack of interest on the patient's part, his business had been on the decline beginning approximately 1/91. He acknowledged to himself that he was 'going broke.' At that time he began to experience severe 'classic panic attacks.' "
 
 
 10
 In 1992, a probe by the Federal Bureau of Investigation's office in Raleigh revealed Benson's bank fraud scheme. Based on the discovery of Benson's scheme, the government filed a criminal information against Benson on November 5, 1992, charging him with four counts of bank fraud. As alleged in the criminal information, Benson's fraud consisted of knowingly submitting false financial statements to four banks during the period from December 18, 1989 until April 17, 1991, in order to obtain thirteen loans totalling more than four million dollars. On the same day, Benson pled guilty to all four counts.
 
 
 11
 A sentencing hearing was held before the district court on February 2 and 3, 1993. The court initially determined, without objection, that Benson's sentencing range under the Sentencing Guidelines was from eighteen to twenty-four months. Benson requested a downward departure from the Guidelines sentence pursuant to U.S.S.G. § 5K2.13 (Diminished Capacity). Thus, the sole question before the district court at sentencing was whether the defendant had met his burden of proving that he committed bank fraud while he was suffering from significantly reduced mental capacity.
 
 
 12
 In support of his request for a downward departure based on diminished capacity, Benson presented the testimony of Dr. Mathew, who began seeing him more than a year after the initiation of his bank fraud scheme. Dr. Mathew testified that when he first saw Benson in May 1991, he was suffering from major depressive disorder and panic disorder. Dr. Mathew also stated that Benson showed some signs of "pseudo dementia," a cognitive dysfunction which sometimes accompanies functional psychiatric disorders. Dr. Mathew gave as an example of such a sign the fact that, according to Benson's friends, Benson "started making mistakes he had never made in the past. He was forgetful about key business dealings, so on and so forth."
 
 
 13
 With respect to Benson's condition at the time of the sentencing hearing, Dr. Mathew stated, "He is very, very severely sick." Dr. Mathew testified that, in his opinion, Benson had been depressed as a result of problems in his marriage for three to four years prior to his admission to Duke Medical Center.
 
 
 14
 Concerning the manner in which Benson's depression allegedly contributed to his commission of the offenses, Dr. Mathew stated that "[Benson] knew what he was doing. What he was not able to do was to attend to the details, to fully comprehend the scope of what he was doing, and to entertain alternatives to what he was doing." In response to cross-examination, Dr. Mathew testified:
 
 
 15
 I'm sure he was able to differentiate between right and wrong. He was not psychotic in the full sense of the word. He knew what he was doing was wrong, but he simply did not care about the consequence, and he was unable to think through what he was doing.... He was going for the shortsighted solutions to complicated problems.
 
 
 16
 During the rebuttal phase of the sentencing hearing, the government presented the testimony of Dr. George Fowles, an expert in forensic psychology, who had reviewed Benson's medical record and case file. He had also spoken to Special FBI Agent Andrew Thomure concerning the case and to Mrs. Taylor concerning Benson himself. Dr. Fowles testified that there was no evidence that Benson was suffering diminished capacity at the time he committed the frauds here involved.
 
 
 17
 Dr. Fowles based his opinion on the chronology of events and the degree of illness described in Benson's medical records. Dr. Fowles testified that he had no doubt Benson was capable of knowing the difference between right and wrong, and could appreciate the consequences of his actions. Further, Dr. Fowles stated that the nature of Benson's offenses and the manner in which he perpetrated them supported the conclusion that Benson was not suffering significantly diminished capacity.
 
 
 18
 After hearing all of the above evidence, the district court concluded that Benson had met his burden under § 5K2.13 and departed downward from the Sentencing Guidelines range of eighteen to twenty four months imprisonment, imposing a sentence of a maximum of six months home detention and a period of probation. The district court indicated in its oral ruling that, in reaching its decision, it relied most heavily on Benson's record and history and on expert opinion. But, the court did not state what specific evidence supported its finding that "while [Benson] was committing these offenses, he was suffering from a significantly reduced medical capacity." Instead, the district judge noted that he ultimately was swayed by the record and the defense psychiatrist's testimony. He did concede that his decision was a "close" one and "extremely difficult."
 
 
 19
 Next, the district court allowed counsel for both sides and the defendant to address the question of what sentence would be appropriate. Again, without pointing to the basis for his decision, the district judge placed Benson on probation for a term of five years and imposed a period of home confinement not to exceed six consecutive months. On appeal, the government has challenged the district court's authority to depart from the Guidelines in the present case and, in the alternative, the degree to which the court departed from the applicable Sentencing Guideline range of 18-24 months.
 
 
 20
 Under 18 U.S.C. § 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guideline if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines that should result in a sentence different from that described." The Guidelines materials clearly indicate that departures "were intended to be quite rare." United States v. Justice, 877 F.2d 664, 666 (8th Cir.), cert. denied, 493 U.S. 958 (1989).
 
 
 21
 In the present case, the district court imposed a sentence below the Guidelines range based on a finding that Benson suffered significantly reduced mental capacity which contributed to the commission of the offense. In section 5H1.3, the Sentencing Commission stated that "[m]ental and emotional conditions are not ordinarily relevant in determining whether a sentence should be outside the Guidelines, except provided in the general provisions of Chapter Five." U.S.S.G. § 5H1.3, p.s. The relevant provision of Chapter Five in the present case, section 5K2.13, contemplates the possibility of a downward departure based on a defendant's mental illness:
 
 
 22
 If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity ..., a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense.
 
 
 23
 U.S.S.G. § 5K2.13, p.s.
 
 
 24
 Reading section 5K2.13 in light of section 5H1.3, the Eleventh Circuit has concluded that "the Commission considered the effect of emotional conditions on culpability and decided that ordinarily mental and emotional conditions are irrelevant to mitigate defendants' culpability, but that in extraordinary instances the conditions may be relevant." United States v. Russell, 917 F.2d 512, 517 (11th Cir. 1990) (emphasis added); accord United States v. Rosen, 896 F.2d 789 (3rd Cir. 1990). Diminished mental capacity that "is present to a degree substantially in excess of that which ordinarily is involved in the offense" may justify a downward departure to the extent which the diminished capacity contributed to the non-violent offense. U.S.S.G. § 5K2.0, p.s.
 
 
 25
 In an attempt to define what constitutes "diminished capacity," most courts have cited two considerations: (1) the ability to understand and to reason, and (2) the capability to distinguish right from wrong. United States v. Johnson, 979 F.2d 396, 401 (6th Cir. 1992); United States v. Hamilton, 949 F.2d 190, 193 (6th Cir. 1991) (affirming district court's refusal to depart downward pursuant to section 5K2.13 because defendant "was able to absorb information in the usual way and to exercise the power of reason"). Additionally, courts have rejected mental abnormalities or deficiencies which appear to satisfy the common meaning of "diminished capacity," including: suicidal tendencies and manic depression, United States v. Harpst, 949 F.2d 860, 862 (6th Cir. 1991); gambling addiction, Hamilton, 949 F.2d at 193; doomsday delusions, United States v. Regan, 989 F.2d 44, 47-48 (1st Cir. 1993); very low IQ, United States v. Lauzon, 938 F.2d 326 (1st Cir. 1991); and severe depression, United States v. Soliman, 954 F.2d 1012, 1014 (5th Cir. 1992). Thus, diminished capacity in the Guidelines context has been read to mean the inability to understand the nature of the offense committed.
 
 
 26
 At sentencing, Benson bore the burden of proving by a preponderance of the evidence that he was entitled to a departure for diminished capacity. United States v. Urrego-Linares, 879 F.2d 1234 (4th Cir. 1989). He needed to do more than simply to prove that he suffered from a mental illness, he had the burden of demonstrating that (1) he suffered a significantly reduced mental capacity, (2) at the time he committed bank fraud, and (3) the diminished capacity was a contributing factor in his committing the fraud.
 
 
 27
 Benson did not provide any evidence that he did not know or was unable to understand the wrongness of his actions. At most, the testimony he offered in support of his motion for a downward departure indicated that he suffered from significant mental and emotional stress and from depression. However, such mental and emotional difficulties do not fall within the legal meaning of diminished mental capacity.
 
 
 28
 Even if we were to assume for the sake of argument that Benson's mental condition was within the meaning of diminished mental capacity, the evidence indicates that he did not become"mentally impaired" until after he began his bank fraud scheme. Therefore, Benson's alleged mental incapacity did not contribute to the initiation of his bank fraud scheme and does not fall within the provisions of section 5K2.13. In fact, the evidence weighs strongly in support of Dr. Fowles' appraisal that Benson's motive for committing the crime (i.e., financial difficulties) and his commission of the crime itself were the factors leading to Benson's severe depression in April 1991.
 
 
 29
 Since the evidence in the record would not be sufficient to satisfy the legal standard in diminished capacity cases, the district court's decision to depart downward was not supported by a preponderance and must be reversed. Benson's sentence is vacated and his case remanded for resentencing in light of this opinion.
 
 REVERSED