NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0633n.06

Case No. 18-2442

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| KEVIN IKE OBI, | ) | **FILED**<br>Dec 20, 2019<br>DEBORAH S. HUNT, Clerk |
| Petitioner-Appellant, | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| UNITED STATES OF AMERICA, | ) | |
| Respondent-Appellee. | ) | **OPINION** |

BEFORE: SUTTON, NALBANDIAN, and READLER, Circuit Judges.

NALBANDIAN, Circuit Judge. Nora Lares spent an evening at Kevin Obi's apartment. Obi provided heroin to Lares, which Lares ingested. And Lares died soon after. But her autopsy revealed other drugs in her system, including ethanol, codeine, and morphine. As a result, Lares died from "[m]ixed drug toxicity." (R. 161-3, Autopsy Report, Page ID # 980.) We consider whether Obi is responsible for Lares's death despite only giving her heroin.

As to his contraband, Obi wants to tell us that these are not the drugs we are looking for. And that might be true, from a certain point of view. Yet he only offers speculative evidence for another cause of Lares's death—his only hope of showing actual innocence. And Obi doesn't believe the expert testimony given at trial supports his conviction. That is why he fails. We AFFIRM.

I.

Kevin Obi and Nora Lares knew each other for years. They met in high school and had an on-again, off-again romantic relationship from 2001 until 2004. They had also taken heroin together several times. In September 2004, Obi and Lares went drinking at a bar with a group of friends. Crystal Brow, a member of the group, observed that Lares frequently went into the bathroom that evening. So Brow suspected Lares consumed cocaine or ecstasy during those bathroom visits.

Later that night, the group went to Obi's house. And they took heroin. The group had access to heroin because Obi was a small time drug dealer. Obi claims Lares snorted .04 grams of heroin, which he supplied, and then snorted another .04 grams a few minutes later. This occurred around 3:20 a.m. After taking the drugs, Lares had sex with Obi.

Soon after, Obi went to his kitchen for a postcoital snack. He found Lares unresponsive when he returned. So Obi and another member of the group tried taking Lares to an urgent care center. That facility was closed, so they called 911. Emergency responders arrived at the urgent care around 4:04 a.m. but could not save Lares. They pronounced her dead at 4:51 a.m. When police arrived on the scene, Obi lied about his and Lares's drug use.

This case centers on the cause of Lares's death. Her death certificate states that she died from "[m]ixed drug intoxication from Heroin, Ethanol[.]" (R. 164-1, Certificate of Death, Page ID # 1030.) And it describes Lares's death as an "accident" resulting from "ingestion of heroin & ethanol to toxic levels." (*Id.*) Dr. David Allen Start, a forensic pathologist employed by the Office of the Medical Examiner for Kent County, conducted Lares's autopsy. He found Lares died by "[m]ixed drug toxicity" suffered by "[a]ccident." (R. 161-3, Autopsy Report, Page ID # 980.)

After the incident, Obi pleaded guilty to distributing heroin resulting in serious bodily injury and death in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C). In his agreement, Obi stipulated to the facts of the incident and acknowledged the mandatory minimum sentence of 20 years. Following the Federal Sentencing Guidelines, the district court sentenced Obi to 300 months' imprisonment. This calculation included an obstruction of justice enhancement because Obi lied to the police about drug use on the night of Lares's death. So Obi appealed his sentence, arguing that his lie did not severely delay the investigation and therefore the obstruction of justice enhancement should not have applied. And the Sixth Circuit agreed with Obi, so it remanded his case for resentencing without the obstruction of justice enhancement. At his resentencing hearing, Obi again received a 300-month sentence. Yet he never challenged the adequacy of his plea on direct appeal. After unsuccessfully appealing his second sentence, Obi filed a petition under 28 U.S.C. § 2255 in November 2014.

In his § 2255 petition, Obi argued the Supreme Court's decision in *Burrage v. United States*, 571 U.S. 204 (2014), rendered his guilty plea invalid. Under *Burrage*, a defendant cannot be guilty for a death caused by distributing drugs unless he is the but-for cause, or an independently sufficient cause, of death. And this rule applies retroactively—a fact the government does not contest.

Yet the retroactive *Burrage* test does not grant an automatic merits review in § 2255 petitions. A defendant must mount a procedurally valid collateral attack on his conviction—for instance, by claiming an involuntary guilty plea. But because Obi never challenged the validity of his guilty plea on direct appeal, this claim fell subject to the procedural default rule. That meant that to excuse his procedural default, Obi had to show actual innocence, i.e., that no reasonable juror would have found him guilty based on evidence in the record.

To resolve this dispute, the district court held an evidentiary hearing. At the hearing, Dr. Start reviewed Lares's autopsy report (which he prepared) and her toxicology report. And he concluded the only drugs present in Lares's system that could have caused her death, aside from heroin, were ethanol and morphine. He testified that Lares had a blood alcohol level of .13 percent when she died. But fatal blood alcohol levels are usually .35 percent or higher. Dr. Start also testified that heroin metabolizes into morphine. That explained the morphine in Lares's toxicology report. Morphine is deadly at 200 nanograms per milliliter, and Lares's blood contained 315 nanograms per milliliter. So Dr. Start reasoned that, but for the heroin, Lares would not have died. But he also stated that fatal levels of morphine depend on the individual, and especially upon prior drug use. Yet he admitted a lack of knowledge about Lares's drug use history. That matters because a first time user would likely die from the morphine present in Lares's bloodstream, while a repeat user with a higher tolerance might be able to withstand morphine levels greater than 200 nanograms per milliliter.

Along with Dr. Start, the court heard from Dr. Benedict Kuslikis, the Director of Toxicology at Spectrum Health, who signed off on Lares's toxicology report. When he reviewed the toxicology report, Dr. Kuslikis did not know Lares's medical history. Addressing Lares's cause of death, Dr. Kuslikis testified that the ethanol present in Lares's system did not reach a lethal level. Moreover, another heroin metabolite, 6-monoacetylmorphine, in Lares's system suggested consumption of heroin within three hours of death. But Dr. Kuslikis also stated that some morphine may have come from codeine, and not just heroin. He also disagreed with Dr. Start's statement that death is almost certain at 315 nanograms per milliliter of morphine. Death, according to Dr. Kuslikis, depends on past usage; a first time heroin user is more likely to die from a lower amount of morphine than an addict. Yet Dr. Kuslikis also stated he would not expect anyone to die from

the mixture of non-morphine drugs present in Lares's system. And he agreed that death could result from the amount of morphine in Lares's system.

After hearing the testimony of Dr. Start and Dr. Kuslikis, the district court denied Obi's § 2255 motion. It did so because the evidence failed to show Obi's actual innocence under the *Burrage* causation test. Obi now appeals, asking this court to invalidate his guilty plea. He argues that the lower court erred by admitting Dr. Kuslikis and Dr. Start's testimonies as evidence and in its analysis of those testimonies.

II.

This court reviews denials of § 2255 petitions de novo for questions of law. *Peveler v. United States*, 269 F.3d 693, 698 (6th Cir. 2001). But we uphold factual findings unless they are clearly erroneous. *Id.*

Obi contends that he did not enter a knowing and voluntary guilty plea given the later-announced causation rule in *Burrage*. Such an error generally provides valid grounds for relief. *Baker v. United States*, 781 F.2d 85, 88 (6th Cir. 1986) ("Baker correctly argues that for a guilty plea to be valid it must be both knowing and voluntary."). But Obi first made this argument in his § 2255 petition, which he acknowledges. A defendant's failure to raise a claim on direct appeal typically bars the defendant from raising it during collateral review. *Benton v. Brewer*, 942 F.3d 305, 307 (6th Cir. 2019). That rule applies for a defendant challenging the validity of his guilty plea. *Waucaush v. United States*, 380 F.3d 251, 254 (6th Cir. 2004).

Yet procedural default is not an absolute bar. A defendant can raise a claim in a § 2255 petition for the first time if he can show either (1) cause for the default and prejudice from the claim being barred, or (2) actual innocence. *Id.* (citing *Bousley v. United States*, 523 U.S. 614, 622

(1998)). Obi argues that the latter applies here. So this court considers whether Obi met the actual innocence standard for distributing heroin resulting in Lares's death.

To succeed, Obi must show that "it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quoting *Schlup v. Delo*, 513 U.S. 298, 327–28 (1995)). And actual innocence means "factual innocence, not mere legal insufficiency." *Id.* Applied here, this requires Obi to show that, under *Burrage*, he did not cause Lares's death by distributing heroin. Moreover, failure to meet this actual innocence standard is fatal to Obi's case—we can only consider the potential defects of Obi's guilty plea if he makes a showing of actual innocence. *Id.* at 623.

The parties raise a threshold question that we must answer before deciding whether Obi can show actual innocence: What evidence can district courts use to resolve an actual innocence claim? We begin with *Bousley*, which informs us that "the Government is not limited to the existing record . . . [and] should be permitted to present any admissible evidence of [the] petitioner's guilt" to rebut a defendant's actual innocence challenge to a guilty plea. *Id.* at 624. Thus, trial courts should permit the government "to present any admissible evidence of [the] petitioner's guilt even if that evidence was not presented during the petitioner's plea colloquy." *Id*. But Obi contends we "do not have any guidance from the Court on what type of proof *Bousley* allows" in post-*Burrage* challenges to pleas. (Appellant Br. at 26.) Especially when the challenge involves expert testimony given at an evidentiary hearing.

In *Burrage*, the Supreme Court clarified the causation requirement of 21 U.S.C. § 841(a)(1) and (b)(1)(C), the same statute governing Obi's case. *Burrage*, 571 U.S. at 206–07. There, the Court examined the "results from" phrase, which the statute does not define. *Id.* at 210. And it found the ordinary meaning of "results from" implies either "but-for causality" or that the

defendant's action must have been an "independently sufficient cause of the victim's death[.]" *Id.* at 210–19.

So the Court applied that test to a case of "mixed drug intoxication[,]" where the victim's autopsy revealed multiple drugs in his system at the time of death. *Id.* at 207 (citation omitted). Because the government conceded that the victim's death did not occur only because of his heroin use, the Court found that the heroin provider could not have been a but-for cause of the victim's death. *Id.* at 219. And providing a drug that combined with other drugs to kill a victim, without proof that the other drugs would have killed the victim on their own, only amounts to a "contributing cause[.]" *Id.* at 218 (citation omitted). That analysis led the Court to reverse the underlying conviction because contributing causes do not create liability under 21 U.S.C. § 814. *Id.* at 218–19.

To obtain a conviction after *Burrage*, the government must show the drug distributed by the defendant would have killed the victim independent of other drugs in the victim's system or that the drug caused a death that would not have otherwise occurred. *Id.* at 216. ("The language Congress enacted requires death to 'result from' use of the unlawfully distributed drug, not from a combination of factors to which drug use merely contributed."). Thus even if the drug in question would not have caused the victim's death on its own, the person who provided the drug is still liable if the drug "was the straw that broke the camel's back." *Id.* at 211. In short, *Burrage* only permits overturning a conviction if the defendant shows uncertainty over whether taking the drug produced a death that would not have otherwise occurred. *Id.* at 215–16.

The alleged tension between *Burrage* and *Bousley* matters because we held in *Harrington v. Ormond* that *Burrage* applies retroactively on collateral review. 900 F.3d 246, 249 (6th Cir. 2018). But we remanded the habeas petition in *Harrington* because we lacked an evidentiary

record to determine whether a reasonable juror would have convicted the defendant under *Burrage*. *Id.* at 250. Obi's case differs from *Harrington* because Obi received an evidentiary hearing before the district court denied his § 2255 motion. And the *Harrington* defendant didn't enter a plea but went to trial. So we now consider the limits on admitting evidence at an evidentiary hearing stemming from a § 2255 challenge to a guilty plea.

By challenging the evidentiary hearing under *Bousley*, Obi gets the question right but the answer wrong. While Obi correctly flags *Bousley* as controlling, he incorrectly reads the case as narrowing the scope of evidence that the government can present. In short, he claims *Bousley* restrains the government from offering evidence that "would not normally have been offered before" *Burrage*. (Appellant Br. at 28). But this gets *Bousley* backward.

Conspicuously, Obi omits the "even if" predicate before the alleged limitation on admitting pre-*Burrage* evidence. *Bousley*, 523 U.S. at 624 ("[T]he Government should be permitted to present *any* admissible evidence of petitioner's guilt *even if* that evidence was not presented during petitioner's plea colloquy and would not normally have been offered before our decision in *Bailey*.") (emphasis added). What's more, *Bousley* states that the government is "not limited to the existing record" created on direct appeal and expands the type of evidence the government may introduce in response to an argument raised on collateral review. *Id.* Nowhere does *Bousley* impose a restriction for evidence rebutting a defendant's actual innocence claim. In short, *Bousley* empowers the government to introduce any otherwise-admissible evidence to disprove the defendant's actual innocence. This is true even if the government failed to present the evidence during the defendant's plea colloquy. So the government can introduce evidence showing guilt under *Burrage* for the first time at an evidentiary hearing, so long as it complies with the Federal Rules of Evidence.

We follow *Bousley* to resolve Obi's objections relating to his evidentiary hearing. *See Waucaush*, 380 F.3d at 257 ("*Bousley*, however, stressed that the Government's evidence refuting actual innocence must be admissible."). Under *Bousley*, the district court had to let the government introduce "any admissible evidence of petitioner's guilt[.]" 523 U.S. at 624. And despite Obi's contention to the contrary, *Burrage* did not change *Bousley*'s evidentiary standard. So we ask whether the district court properly admitted the doctors' testimony at the § 2255 evidentiary hearing.

Obi claims the district court improperly admitted the medical testimony for two reasons: (1) the doctors made unfounded assumptions about Lares's prior drug use and (2) the doctors lacked personal knowledge of the case. Both arguments invoke the same evidentiary doctrine: the need for proper foundation. But Obi did not make this objection during the hearing, so he must show the court committed plain error by admitting the doctors' testimony. *United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004).

In essence, Obi argues the lower court erred by relying on testimony from Dr. Kuslikis and Dr. Start because they did not have firsthand knowledge of Lares's drug use history. But neither doctor testified about the details of Lares's medical history, aside from acknowledging their unfamiliarity with Lares's drug use when they prepared and reviewed her reports. Instead, the doctors only gave generalized testimony about morphine's effects on experienced and inexperienced users. And the government showed that each witness had proper qualifications in the medical field.

While Obi has a point that Lares's drug history is relevant, he cites no rule that expert testimony must engage with all relevant facts or that medical testimony must consider particular attributes of the victim. That's because there is no such rule. *See In re Scrap Metal Antitrust Litig.*,

527 F.3d 517, 530 (6th Cir. 2008) (explaining that weakness in the factual basis of an expert opinion bears on the weight of the evidence and not admissibility). Obi argued below that the witnesses, especially Dr. Kuslikis, did not establish that the heroin Obi provided caused Lares's death because they could not explain why 315 nanograms per milliliter of morphine could kill an experienced heroin user. But the doctors testified about the nature of ethanol, heroine, and morphine and how those drugs explain the reports they reviewed. Far from making an unsupported guess, both doctors relied on their medical background and the facts in Lares's reports. For that reason, the district court did not commit plain error by admitting the doctors' testimony.

Finding the district court committed no error of law when it admitted Dr. Start and Dr. Kuslikis's testimonies, we review the district court's factfinding only for clear error. Obi claims that the expert medical testimony did not show a causal connection, at least under the *Burrage* standard, between his distribution of heroin and Lares's death. To make his case, he contends that the experts merely speculated on why the toxicology report showed codeine in Lares's system. He also states that the record does not rule out that the heroin causing Lares's death came from a source other than Obi. And finally he stresses that Dr. Kuslikis opined that the amount of morphine in Lares's system might not have been lethal, especially for a repeat heroin user.

But none of these challenges establishes that the lower court committed clear error in its factual determination. *See Village of Milford v. K-H Holding Corp.*, 390 F.3d 926, 936 (6th Cir. 2004) ("[C]ausation is a question of fact, [so] this court reviews the finding for clear error.") To rule for Obi, the lower court needed to conclude that no reasonable juror could find the heroin provided by Obi would have killed Lares independent of the other substances in her system. Looking at the doctors' testimony about the minimal importance of Lares having ethanol and codeine in her system and about the medically lethal amount of morphine, the district court ruled

against Obi. Obi offers this court speculative reasons why that ruling might have been wrong, such as Lares ingesting heroin from another source or using a different drug earlier in the night. But we cannot overturn the lower court's factfinding based on speculative counterarguments alone. And the lower court relied on valid expert testimony stating that the heroin and heroin byproduct in Lares's system reached a fatal level. Although Obi can point to evidence in the record supporting his case, he cannot show why reviewing the lower court "leaves us with the definite and firm conviction that a mistake has been committed." *See United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017) (quoting *United States v. Yancy*, 725 F.3d 596, 598 (6th Cir. 2013)). And that is what he must do to prevail under the clear error standard. *Id.* Thus, Obi fails to offer a compelling argument for his actual innocence. Without a successful actual innocence showing, Obi cannot overcome procedural default for challenging his guilty plea.

III.

Because Obi cannot establish an exception to procedural default, we need not consider his other arguments. Thus, we AFFIRM the district court's order denying Obi's § 2255 motion.