Filed:  November 4, 1997

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

------------------

Nos. 95-5908(L)
(CR-95-16)

------------------

United States of America,

Plaintiff - Appellee,

versus

Troy Dennis Cropp, et al,

Defendants - Appellants.

------------------

O R D E R

------------------

The Court amends its opinion filed October 10, 1997, as follows:

On the cover sheet, section 2 -- the case number of the third case is corrected to read "96-4105."

On page 2, section 3, line 6 -- the "on brief" section is corrected to read:  "Robert P. Crouch, Jr., United States Attorney, Joseph R. Palmore, Third-year Law Student, University of Virginia School of Law, Charlottesville, Virginia, for Appellee."

For the Court - By Direction

/s/ Patricia S. Connor

------------------

Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                     No. 95-5908

TROY DENNIS CROPP,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                     No. 95-5915

CLYDE GARCIA CROPP,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                     No. 96-4105

MONTE CLAY MOSLEY,
Defendant-Appellant.

Appeals from the United States District Court

for the Western District of Virginia, at Charlottesville.
James H. Michael, Jr., Senior District Judge.
(CR-95-16)

Argued: November 1, 1996

Decided: October 10, 1997

Before ERVIN, Circuit Judge, BOYLE, United States District Judge for the Eastern District of North Carolina, sitting by designation, and JACKSON, United States District Judge for the Eastern District of Virginia, sitting by designation.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in which Judge Boyle and Judge Jackson joined.

_____

**COUNSEL**

**ARGUED:** Bruce Robert Williamson, Jr., WILLIAMSON & TOSCANO, Charlottesville, Virginia, for Appellant Clyde Cropp; David Leonard Heilberg, Charlottesville, Virginia, for Appellant Troy Cropp; Billy Lee Ponds, THE PONDS LAW FIRM, Washington, D.C., for Appellant Mosley. Ray B. Fitzgerald, Jr., Assistant United States Attorney, Charlottesville, Virginia, for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United States Attorney, Joseph R. Palmore, Third-year Law Student, University of Virginia School of Law, Charlottesville, Virginia, for Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

Troy Dennis Cropp (Troy Cropp), Clyde Garcia Cropp (Clyde Cropp) and Monte Clay Mosley (Monte Mosley) challenge their criminal convictions and the sentences given them by the district court. Troy and Clyde Cropp and Mosley jointly raise two of the issues in this appeal, while the remaining issues are raised by only one or two of the appellants. For the reasons hereinafter explored we affirm all of the challenged convictions and sentences.

I

The Cropps and Mosley were charged, along with numerous others, with conspiracy to distribute crack cocaine in violation of 18

2

U.S.C. § 841 and all three pleaded not guilty. Several of the indicted co-conspirators cooperated with the government and testified against the others at trial. The jury found the three appellants guilty, found two indictees not guilty, and could not reach a verdict with respect to two other alleged conspirators.

The conspiracy in which appellants were involved distributed crack in the Jeffersonton area of Culpeper County, Virginia. We will only undertake a brief and general recitation of some of the evidence introduced at trial, much of which was presented through the testimony of cooperating coconspirators. The conspiracy began sometime before January of 1992 and lasted until at least March 9, 1995, the date of the indictment. In the conspiracy, sources for large quantities of crack would, often through middlemen, provide street dealers with drugs for distribution. This crack was then sold in an area in front of two adjoining houses. One house was owned by Leo Mosley and the other was owned by an elderly relative of Leo Mosley.

The evidence showed that Monte Mosley, an appellant, acquired crack in large quantities and provided it to other members of the conspiracy in small quantities for distribution in front of the houses. Other suppliers also provided crack for sale at that location. Troy Cropp and Clyde Cropp were among the conspirators who sold crack in small quantities to motorists who drove by the houses.

At least one witness, and in some instances several, testified that Troy Cropp, Clyde Cropp, and Monte Mosley had each been seen with various quantities of crack on several occasions. When Troy Cropp and other dealers were selling crack in front of the houses, they would cooperate with one another. Specifically, when one dealer took a break he or she would stash drugs in the woods across the street from the houses and the other dealers would "keep an eye" on the stash.[1] Further, the evidence showed that the traffic in front of the houses was sometimes backed up five cars or more, and that all of the dealers took turns approaching cars to sell crack, including Troy Cropp and Clyde Cropp.

_____

[1] It is not clear whether Clyde Cropp participated in this scheme or not.

3

Troy Cropp received crack from at least three different direct suppliers, at least one of whom obtained crack in bulk from Monte Mosley. Clyde Cropp sold crack that he received from at least one source, and that source obtained drugs on certain occasions from Monte Mosley. Several witnesses stated that they had seen Troy or Clyde Cropp sell drugs at the houses, and that they had purchased drugs from Troy or Clyde Cropp. Both Troy and Clyde Cropp stipulated that, on two occasions each, they sold crack to different undercover officers in front of the crack houses.

Three persons testified that they obtained large quantities of crack from Monte Mosley and then resold the drugs. At least two of those witnesses indicated that the drugs purchased from Monte Mosley were sold either directly or through another dealer in front of the crack houses.

The evidence indicated that Troy and Clyde Cropp both used crack. No evidence suggested that Monte Mosley used crack. While a great deal of other evidence was presented regarding other conspirators, or regarding specific instances involving the appellants, we do not find it necessary to recount that evidence.

II

Troy and Clyde Cropp and Monte Mosley all assert that the district court improperly limited their right to cross-examine government witnesses about the incentive to lie created by the witnesses' cooperation agreements. We do not agree. We review the district court's decision to limit cross-examination for an abuse of discretion. United States v. Ambers, 85 F.3d 173, 175 (4th Cir. 1996).

At trial below most of the government's witnesses were co-conspirators. The credibility of those witnesses was very relevant to the case against all of the defendants. Prior to the start of cross-examination of the first cooperating witness, the district court ruled that the defense could not ask about the specific penalties that the cooperators would have received absent cooperation, or about the specific penalties they hoped to receive due to their cooperation. The district court suggested that asking witnesses about the sentences they expected to receive would impinge upon the court's discretion to ulti-

4

mately decide those sentences. The district court was also concerned that if the jury could infer the very long sentences faced by the appellants from knowing the sentences faced by the co-conspirators, the jury members would hesitate to find the appellants guilty even if the evidence proved their guilt. Ultimately the court did allow defense counsel to ask witnesses whether they had signed plea agreements, whether they faced a "severe penalty" prior to cooperating, and whether they expected to receive a lesser sentence as a result of the cooperation, but the court did not allow questions about the specific penalties at stake.

The Supreme Court has stated that a defendant's right to cross-examine cooperating witnesses about sources of potential bias is guaranteed by the Confrontation Clause of the Constitution. Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986). In Van Arsdall the Court found the trial judge had unconstitutionally refused to allow defendants to inquire in any way about cooperation. Id. However, the Court also made clear that trial courts retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 679.

In the instant case, we do not credit the district court's first ground for not allowing the questioning, namely that to do so would impinge upon his discretion. As the appellants made clear in their brief and at trial, they did not intend to explore the actual sentences that the witnesses would receive, as that remained in the sole discretion of the sentencing judge. Rather, the defense sought to inquire about what the witnesses believed their sentences would have been and what they hoped to receive by virtue of their cooperation. We agree that the witness' expectations, rather than the actual sentence eventually given, were the potential sources of their possible bias. See Hoover v. Maryland, 714 F.2d 301, 305 (4th Cir. 1983); Ambers, 85 F.3d at 176.

We do, however, agree with the district court's concern that the jury might "nullify" its verdict if it knew the extreme penalties faced by the appellants. Although we have not yet squarely decided whether limitations such as those employed in this case are proper remedies for jury nullification, we have made several related decisions which

5

guide us in this matter. In <u>Ambers</u>, 85 F.3d at 175, we affirmed a district court's decision not to allow the defense to question witnesses about the specific Sentencing Guideline ranges they faced before and after cooperation. We found that the district court in <u>Ambers</u> had been correctly concerned that a discussion of the mechanics of the Guidelines would needlessly confuse the jury. <u>Id.</u> at 176. Relying on <u>Van Arsdall</u>, we held that the trial judge is allowed to impose reasonable limits upon cross-examination. <u>Id.</u>

Similarly in <u>United States v. Odom</u>, 736 F.2d 104, 108 (4th Cir. 1984), we affirmed a trial court's decision not to allow further cross-examination about bias when the witness had already answered enough questions to show that she did indeed possess a reason to lie. <u>See also United States v. Dorta</u>, 783 F.2d 1179, 1182 (4th Cir. 1986) (finding that the court properly halted questions into maximum total sentence expected when several other questions already revealed significant incentives to lie). <u>But see Hoover v. Maryland</u>, 714 F.2d 301 (4th Cir. 1983) (reversing conviction when defense was precluded from examining penal benefits from witness' cooperation in any way).

Admittedly, there is a distinction between the instant case and most of our prior decisions affirming limitations placed upon cross-examination. In this case the appellants were not permitted to ask any quantitative questions whatsoever about the benefits which witnesses expected to receive for their cooperation. In much of the Fourth Circuit authority cited by the government in support of its position, the defense had been allowed to ask at least some questions about the length of sentences at issue. <u>See, e.g.</u>, <u>Ambers</u>, 85 F.3d at 175; <u>Dorta</u>, 783 F.2d at 1182 & n.6. The appellants argue that the length of the possible benefit in years and months is itself relevant to the issue of bias of government witnesses; presumably the greater a sentence faced by a witness absent cooperation, the less believable the testimony of the witness.

We do not find that this small distinction between our prior authority and the instant case requires us to depart from the direction of our precedent. We are guided by a recent First Circuit case which affirmed a trial court's decision to disallow all inquiry into years of confinement faced by witnesses. <u>United States v. Luciano-Mosquera</u>,

6

63 F.3d 1142, 1153 (1st Cir. 1995), <u>cert. denied</u>, 116 S.Ct. 1879 (1996). The <u>Luciano-Mosquera</u> court found that any probative value from the jury's knowledge of the actual number of years faced was slight compared to its certain prejudicial impact. <u>Id.</u> at 1153. The court specified that the proper inquiry for a reviewing court is whether the jury possesses sufficient evidence to enable it to make a "discriminating appraisal" of bias and incentives to lie on the part of the witnesses. <u>Id. See also Delaware v. Fensterer</u>, 474 U.S. 15, 20 (1985) (per curiam) ("[T]he Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense may wish.").

We embrace the reasoning enunciated in <u>Luciano-Mosquera</u>. The appellants in the instant case have been unable to explain why questions about exact sentences feared and sentences hoped for were <u>necessary</u> when the jury was already well aware that the witnesses were cooperators facing severe penalties if they did not provide the government with incriminating information. Against whatever slight additional margin of probative information gained by quantitative questions, we must weigh the certain prejudice that would result from a sympathetic jury when it learns that its verdict of guilty will result in sentences of ten and twenty years in prison. Finding no abuse of discretion, we therefore affirm the limitations placed on cross-examination by the district court in this case.

III

Troy Cropp, Clyde Cropp, and Monte Mosley next argue that the district court gave a modified <u>Allen</u> charge that impermissibly coerced jurors in the minority to change their views. <u>Allen v. United States</u>, 164 U.S. 492 (1896). An <u>Allen</u> charge is given by a trial court when a jury has reached an impasse in its deliberations and is unable to reach a consensus. <u>Id.</u> We must review the district court's decision to give an <u>Allen</u> charge and the content of that charge for an abuse of discretion. <u>United States v. Antonio Burgos</u>, 55 F.3d 933, 935 (4th Cir. 1995).

Our recent decision in <u>Antonio Burgos</u> provides an excellent summary and assessment of our extensive precedent exploring the proper

7

scope of <u>Allen</u> charges. <u>Id.</u> at 936-41. As <u>Antonio Burgos</u> made clear, an <u>Allen</u> charge must not coerce the jury, and it must be fair, neutral and balanced. <u>Id.</u> at 936. <u>See also Carter v. Burch</u>, 34 F.3d 257, 264 (4th Cir. 1994) (discussing the required components of an <u>Allen</u> charge). Courts must be extremely careful not to suggest that jurors give up firmly held convictions, although courts may instruct jurors to reconsider the evidence and the views of other jurors. "The most egregious mistake that can be made in the context of an <u>Allen</u> charge is for a district court to suggest, in any way, that jurors surrender their conscientious convictions." <u>Antonio Burgos</u>, 55 F.3d at 939. We have often emphasized that a proper and non-coercive charge must instruct the jurors in the minority to reconsider the views of the majority and must instruct the majority to reconsider the minority position. <u>Id.</u> at 937, 940; <u>United States v. Sawyers</u>, 423 F.2d 1335, 1342-43 (4th Cir. 1970).

Applying these standards to the instant case, we do not believe that the instructions given were impermissibly coercive. The district court gave the jurors a lengthy <u>Allen</u> charge after the jurors expressed an inability to reach a consensus. In this charge the court properly told both the majority and the minority to consider the views of the other side and told the jurors not to surrender their firm convictions. The next morning the judge further instructed the jury about several matters before releasing them to resume their deliberations. In this second charge the court explicitly reminded the jury that it should add the new instruction to the instructions which they had already received. Even in this brief reminding charge the court told the jurors not to give up their firmly held convictions.

The appellants assign error to the very brief second charge because it did not contain all of the elements of an <u>Allen</u> charge required by <u>Antonio Burgos</u>, and because they assert it reflected the court's impatience with the jury and was therefore impermissibly coercive.[2]

_____

**2** The court told the jury, in part: "This case has extended over some five days of testimony, though it has not moved as smoothly and continuously as both Court and counsel would desire. Where there's a trial involving a prosecution with seven individual defendants, the complications encountered add unavoidably to the interruptions . . . ."

8

We do not find these arguments to be persuasive. First, we do not evaluate a judge's instructions in isolated segments, but we look at the instructions given as a whole. United States v. Muse, 83 F.3d 672, 677 (4th Cir.), cert. denied, 117 S. Ct. 261 (1996). Moreover, we do not adopt appellants' characterization that the second brief charge revealed impatience with the jury. In fact the impatience in the tone of the charge, if there was any, was directed at the court, the lawyers, and the delays associated with a multi-defendant trial. The court's other interactions with the jury also did not suggest impatience. Rather, the court provided the jury with replays of evidence it requested both before and after the second charge and answered the jury's questions about whether it could return seven separate verdicts for the seven defendants, all in a calm, respectful manner.

Finally, the jury's own behavior reassures us that they were not coerced by the instruction or anything else. Following the second charge, the jury deliberated for an additional seven hours before reaching verdicts. Although the length of deliberations following an Allen charge is not certain evidence that the jury was not coerced by that charge, Antonio Burgos, 55 F.3d at 940 n.7, lengthy deliberations can reassure a reviewing court that coercion did not occur. United States v. Russell, 971 F.2d 1098, 1108 (4th Cir. 1992) (finding that three hours of deliberations were evidence that a jury was not coerced). Not only did the jury in the instant case deliberate for a long time, but they returned several different verdicts, including some not-guilty verdicts and some dead-locks. We find it unlikely that a jury independent enough to return not-guilty verdicts for some defendants could have been coerced by the court with respect to others. There-fore, we hold that the district court did not abuse its discretion in instructing the jury in this case.

IV

Troy and Clyde Cropp argue that the jury did not possess sufficient evidence to convict them of conspiracy to distribute crack. Specifi-cally, they argue that no evidence proved the existence of an actual conspiracy and that, at best, the evidence suggested several com-pletely independent dealers working in the same geographic area. "In Glasser [v. United States], the Supreme Court explained that a jury verdict `must be sustained if there is substantial evidence, taking the

9

view most favorable to the Government, to support it.'" United States v. Frank Burgos, 94 F.3d 849, 862 (4th Cir. 1996), cert. denied, 117 S. Ct. 1087 (1997) (quoting Glasser, 315 U.S. 60, 80 (1942)). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." Id. To sustain its burden at trial the government was required to prove that a conspiracy existed, that the Cropps both knew it existed, and that they knowingly entered into the conspiracy. Frank Burgos, 94 F.3d at 857. Proof of a conspiracy can be circumstantial, and the government need not prove that all participants knew of all aspects of the conspiracy. Id. at 858.

Having thoroughly reviewed the record, we are satisfied that there was ample evidence to convince a reasonable jury of the guilt of Troy and Clyde Cropp beyond a reasonable doubt. Rather than recount all of the evidence adduced at trial we will simply highlight some of the testimony proving the elements of conspiracy.

With respect to the existence of a conspiracy, testimony proved that many dealers worked in front of the houses at a given time; that they took turns approaching cars; that certain dealers spoke with one another about a shortage of drugs and the need to obtain additional supply; and that the many sellers were supplied by the same few suppliers. Testimony even showed that the dealing in front of the houses occurred in a similar manner almost every day for years. This combination of circumstantial and direct evidence certainly supports a jury's finding that a conspiracy to distribute crack existed.

Likewise the trial evidence proved that Troy and Clyde Cropp were knowingly involved in the conspiracy. Multiple witnesses testified that they saw Troy and Clyde Cropp with drugs in their possession and saw them selling drugs in front of the houses. One supplier specifically testified that Troy and Clyde Cropp both sold crack at that location, crack that he or other dealers had provided. Further, both Troy and Clyde Cropp stipulated that, on two occasions each, they sold crack in front of the houses to undercover officers. The testimony showed that the Cropps both obtained crack from the same small number of suppliers who sold to the other members of the conspiracy.

10

The evidence presented at trial, when taken in the light most favorable to the government, is adequate to sustain the convictions of Troy and Clyde Cropp.

V

Troy Cropp argues that the district court violated his Due Process rights by refusing to grant his request for a psychiatric evaluation prior to determining his sentence. Cropp requested the evaluation so that he could better argue for a downward departure for significantly reduced mental capacity pursuant to § 5K2.13 of the Guidelines. We believe that the power of a judge to grant or deny requests for psychiatric evaluations for sentencing purposes is a question of first impression in this Circuit.

As a preliminary matter, we must decide whether we have the authority to review the district court's decision regarding this issue. As we have repeatedly made clear, a decision to deny a departure request may generally only be reviewed when a judge has misunderstood his or her legal authority to grant a departure. United States v. Underwood, 970 F.2d 1336, 1338 (4th Cir. 1992); United States v. Bayerle, 898 F.2d 28, 31 (4th Cir. 1990). In this case the district court knew that it possessed the power to depart and decided that the evidence did not move him to grant that departure. On that basis the government urges that we lack authority to consider this question further.

We agree with Cropp that the right at issue is a Due Process right to present evidence relevant to sentencing and that this right must not be left to the sole discretion of the court. We have previously recognized a specific right to have one's sentence correctly determined and have reviewed district court decisions when that right was at issue. See, e.g., United States v. Urrego-Linares, 879 F.2d 1234, 1239 (4th Cir. 1989). In Urrego-Linares we further stated that defendants have a right to offer evidence relevant to mitigation. Id. Given this authority, we find that we cannot characterize this issue as a case in which the judge has simply decided not to depart, and therefore we cannot treat it as non-reviewable.**3** Rather, the question before us is whether

_____

**3** We are also mindful of the Supreme Court's recent decision in United States v. Koon, 116 S.Ct. 2035 (1996), which stated that a district court's decision to depart in an "atypical case" is to be reviewed for an abuse of discretion, although that decision is not controlling in the instant case.

11

a judge may take steps which effectively limit an indigent defendant's ability to present evidence relevant to a downward departure.

The commentary to the Sentencing Guidelines requires that a defendant be given an adequate opportunity at sentencing to present information regarding disputed facts relevant to the sentencing determination. U.S.S.G. § 6A1.3, commentary; see also United States v. Cantu, 12 F.3d 1506, 1511 (9th Cir. 1993) (interpreting § 6A1.3). The commentary further specifies that a judge must tailor the process for presenting evidence at sentencing to "the nature of the dispute, its relevance to the sentencing determination, and applicable case law." U.S.S.G. § 6A1.3, commentary; see also Cantu, 12 F.3d at 1511. In Cantu the Ninth Circuit explored the relevant Guidelines provisions and decided that the process adopted by a trial judge to address downward departure for diminished mental capacity pursuant to U.S.S.G. § 5K2.13 must be "more than simply a neutral process." Cantu, 12 F.3d at 1511. "The court's inquiry into the defendant's mental condition and the circumstances of the offense must be undertaken `with a view to lenity, as section 5K2.13 implicitly recommends.'" Id. (quoting United States v. Chatman, 986 F.2d 1446, 1454 (D.C. Cir. 1993)). While the court in Cantu was addressing an issue distinct from the one before us in this case, its guidance is relevant.

Troy Cropp has asserted that the above analysis provided by our sister circuits and several of our own previous decisions support his position that he is entitled to a court-appointed psychiatric evaluation. However, we do not agree that any of this precedent compels such a holding. In United States v. Mason, 52 F.3d 1286 (4th Cir. 1995), we reversed a conviction because the trial judge refused to order a hearing to determine defendant's competence to stand trial. That decision, however, was grounded in a statute which plainly requires judges to grant a competency hearing when a defendant has shown "reasonable cause." Id. at 1289 (relying upon 18 U.S.C. § 4241(a)). No statute similarly requires trial judges to grant hearings before sentencing proceedings. Likewise, in both United States v. Hoover, No. 93-5441, 1994 WL 144330 (4th Cir. Apr. 22, 1994), and United States v. Benson, No. 93-5204, 1993 WL 385213 (4th Cir. Sept. 30, 1993), two unpublished opinions relied upon by Troy Cropp, the district court had considered psychiatric and psychological evidence presented by defendants. However, in neither case did we suggest that defendants

12

always have a right to develop the relevant evidence. Moreover, we are unaware of a decision by any other circuit in which the court has concluded that defendants are entitled to psychological testing prior to being sentenced.

Despite the lack of binding or persuasive authority on this issue, we decline to adopt the position advocated by the government. We do not hold that it could never be reversible error for a court to refuse to order a psychiatric evaluation prior to sentencing. It is important that judges make critical sentencing decisions with the benefit of all available and relevant evidence. It is also important that all defendants, even indigent ones, have an opportunity to gather necessary psychiatric evidence when the court, in the exercise of its discretion, determines that such evidence is relevant to determine the defendant's mental capacity.

However, we hold that in the instant case the district court did not abuse its discretion by declining to order an evaluation for Troy Cropp. Cropp presented very little evidence to indicate that he in fact suffered from a mental impairment; the evidence he did submit was very old, and even if taken as current, did not indicate that Cropp suffered from mental incapacity. Moreover, the district court in this case did consider the evidence before it, and listened to and considered Cropp's assertion that he suffered brain damage and mental illness as a result of years of crack cocaine use. Cropp is unable to suggest what additional information would have been gained by a formal psychiatric evaluation.

VI

Monte Mosley finally argues that the district court erred when it excluded the testimony of his witness, Chris Carter (Carter), for a violation of the court's sequestration order. We find that Mosley's challenge does not require reversal. Federal Rule of Evidence 615 addresses the exclusion and sequestration of witnesses. The rule and its common-law antecedents are designed to prevent the tainting of witness testimony by precluding them from hearing the trial testimony of other witnesses. The Supreme Court has long recognized that a trial court may employ one of three remedies when a sequestration order has been violated: sanction of the witness; instructions to the

13

jury that they may consider the violation toward the issue of credibility; or exclusion of the witness' testimony. <u>See, e.g.</u>, <u>Holder v. United States</u>, 150 U.S. 91 (1893). The remedy of exclusion is so severe that it is generally employed only when there has been a showing that a party or a party's counsel caused the violation. <u>See Braswell v. Wainwright</u>, 463 F.2d 1148, 1152-53 (5th Cir. 1972); <u>United States v. Hobbs</u>, 31 F.3d 918, 922 (9th Cir. 1994). Because exclusion of a defense witness impinges upon the right to present a defense, we are quite hesitant to endorse the use of such an extreme remedy.

In the instant case, the right to present a defense has come into direct conflict with the protection against tainted testimony. Carter was called as a witness for Monte Mosley. Carter testified that he had never purchased any drugs from Mosley, and that he had never seen Mosley with drugs. During his testimony, it became clear that Mosley talked to Carter prior to Carter's turn on the stand in plain violation of the sequestration order. In fact it appears that Mosley told Carter that his name had been mentioned in the previous day's testimony. Although Mosley denies it, it is possible that Mosley in fact told Carter that there had been previous testimony that Carter had purchased crack from Mosley on numerous occasions. The district court therefore decided to exclude Carter's testimony by telling the jury to disregard what he had said on the stand.

We believe that the court would have been well advised to employ a lesser sanction to punish the violation because to do so would have preserved both the purpose of the sequestration rule and the defendant's right to present a defense. We also find that the court should perhaps have more closely examined Carter in voir dire to determine the extent of the taint of his testimony and the causes of that taint prior to excluding him. However, we have found no precedent in which we have overturned the decision of a district judge to exclude a defense witness when the violation was plainly the fault of the defendant or defendant's counsel. And given that it is clear that Mosley himself was behind this violation in some way, we do not find that the district court abused its discretion. We are particularly unwilling to overturn the district court's judgment on this issue given that the defense did not argue to the court during trial that the exclusion of Carter was excessive or unconstitutional.

14

VII

We find that none of the challenges raised by Troy Cropp, Clyde Cropp, and Monte Mosley to their convictions or to their sentences merit reversal. Therefore we

<u>AFFIRM</u>.

15