**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 13-4630**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JORGE PETER CORNELL, a/k/a King J, a/k/a King Jay,

Defendant - Appellant.

---

**No. 13-4644**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ERNESTO WILSON, a/k/a King Yayo,

Defendant - Appellant.

---

**No. 13-4877**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

RUSSELL LLOYD KILFOIL, a/k/a King Peaceful, a/k/a Jonathan Hernandez,

Defendant - Appellant.

---

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. James A. Beaty, Jr., Senior District Judge. (1:11-cr-00402-JAB-1; 1:11-cr-00402-JAB-14; 1:11-cr-00402-JAB-2)

---

Argued: January 29, 2015                    Decided: March 16, 2015

---

Before KING and AGEE, Circuit Judges, and DAVIS, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Agee wrote the opinion, in which Judge King and Senior Judge Davis joined.

---

**ARGUED:** Michael W. Patrick, LAW OFFICE OF MICHAEL W. PATRICK, Chapel Hill, North Carolina; Brian Michael Aus, BRIAN AUS, ATTORNEY AT LAW, Durham, North Carolina; Curtis Scott Holmes, BROCK, PAYNE & MEECE, PA, Durham, North Carolina, for Appellants. Sonja M. Ralston, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF**: Leslie R. Caldwell, Assistant Attorney General, David A. O'Neil, Acting Deputy Assistant Attorney General, Leshia M. Lee-Dixon, Organized Crime and Gang Section, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Ripley Rand, United States Attorney, Greensboro, North Carolina, Robert A.J. Lang, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Winston-Salem, North Carolina, for Appellees.

---

AGEE, Circuit Judge:

This case arises from the prosecution of several members of a violent street gang known as the Latin Kings. Following a multi-week trial, a jury convicted Jorge Cornell, Russell Kilfoil, and Ernesto Wilson (collectively "Defendants") of conspiracy to violate the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d), based on their activities in connection with the Greensboro, North Carolina chapter of the gang. On appeal, Defendants make several assertions of error concerning their trial, primarily focusing on the district court's jury instructions and the sufficiency of the evidence. Finding no reversible error, we affirm the judgment of the district court.

I.

The Latin Kings is a nationwide street gang with power centers in Chicago and New York. At the local level, including in the state of North Carolina, groups of Latin Kings are organized into "tribes" anchored to a specific geographic area. Each tribe has a multi-level leadership structure denominated as the First through Fifth Crowns. The First Crown leads the tribe, giving orders and running the group, with each descending Crown assigned lesser leadership tasks. Full members of the gang are traditionally given "King Names" or "Queen Names,"

3

which is how they are known within the organization and to others on the street. The gang finances itself through weekly membership dues and the proceeds of various illegal activities its members undertake. These funds are used to buy food, clothing, and guns, as well as to support members who are incarcerated. Central to the organization is a culture of violence, which is manifested through frequent disputes with rival gangs. Violence and the threat of violence are also used to maintain compliance with gang rules.

Count I of the controlling indictment charged Defendants and eleven others with "knowingly and intentionally conspir[ing] to conduct and participate, directly and indirectly, in the conduct of the affairs of [a criminal] enterprise through a pattern of racketeering activity," in violation of 18 U.S.C. § 1962(d). J.A. 155. The criminal enterprise was identified as the Latin Kings, "a violent street gang with thousands of members" who "operated in the Middle District of North Carolina since at least 2005." J.A. 147, 151.[1]

---

[1] The indictment further charged Cornell with assault with a firearm in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(3), and discharging a firearm in the course of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(iii). Cornell was convicted on both charges, but he does not challenge those convictions on appeal and therefore they are not discussed below.

4

Defendants proceeded to trial along with four co-defendants. With the aid of several cooperating witnesses, the Government presented extensive testimony about the Greensboro tribe's illegal activities, which included attempted murder, armed robbery, and bank fraud. The Government also presented evidence that Cornell, known as "King Jay," served as the First Crown of the Greensboro tribe throughout the conspiracy. Kilfoil, "King Peaceful," was likewise identified as holding a variety of leadership positions in the tribe. Wilson was not a member of the gang, but the Government offered evidence that he participated in several robberies with the Latin Kings at Cornell's direction and associated with the gang on a number of occasions.

At the close of evidence, the district court dismissed the charges against one co-defendant and sent the case to the jury. After deliberating for approximately three days, the jury convicted Defendants on the RICO conspiracy charge and acquitted the remaining co-defendants. The jury returned identical verdict forms for each Defendant, with special findings that the members of the conspiracy had either planned or committed one murder conspiracy, one attempted murder, multiple robberies, one act of interference with interstate commerce by threats or violence, and multiple acts of bank fraud.

Defendants moved for post-trial relief, raising many of the same arguments now advanced on appeal. The district court denied their motions and sentenced Cornell to 336 months' imprisonment, Wilson to 204 months' imprisonment, and Kilfoil to 180 months' imprisonment. Defendants timely appealed and we have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## II.

Defendants raise several assignments of error on appeal, some individually and some jointly. We address the joint claims first, setting forth additional facts in context.

### A.

Defendants were each convicted of conspiracy to participate in a racketeering enterprise in violation of 18 U.S.C. § 1962(d). "[T]o satisfy § 1962(d), the government must prove that an enterprise affecting interstate commerce existed; 'that each defendant knowingly and intentionally agreed with another person to conduct or participate in the affairs of the enterprise; and . . . that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.'" United States v. Mouzone, 687 F.3d 207, 218 (4th Cir. 2012) (alteration in original) (citation omitted). Thus, as part of its conspiracy

6

case against Defendants, the Government was required to establish that the alleged RICO enterprise affected interstate commerce.

Following this Court's precedent, see United States v. Gray, 137 F.3d 765, 772-73 (4th Cir. 1998) (en banc), the district court decided that a de minimis effect on interstate commerce is all that was required to satisfy RICO's commerce element. See also United States v. Williams, 342 F.3d 350, 354 (4th Cir. 2003) ("[W]here the [federal statute] reaches a quintessentially economic activity that, taken in the aggregate, substantially impacts interstate commerce, the minimal effects standard does not contravene the teachings of [the Supreme Court.]"). The district court thus instructed the jury that "[t]he Government must prove . . . the enterprise activity affected interstate or foreign commerce in any way, no matter how minimal." J.A. 4363.

Defendants claim that this instruction was in error because § 1962(d) requires more than a de minimis effect on interstate commerce in cases where the enterprise has not engaged in economic activity. According to Defendants, the Latin Kings were not shown to have conducted considerable economic activity, and therefore "the Government must prove that the alleged RICO enterprise has a substantial effect on interstate commerce as an essential, constitutional, and jurisdictional element of the

7

crime justifying the federal reach of the RICO statute." Opening Br. 23. As support, Defendants cite Waucaush v. United States, 380 F.3d 251 (6th Cir. 2004).

In Waucaush, the Sixth Circuit concluded that where an alleged criminal enterprise engaged in conduct "classified as conduct of the noneconomic strain" a "minimal effect on commerce will not do." Id. at 256. In that case, Waucaush and his fellow gang members murdered, conspired to murder, and assaulted members of a rival gang. Id. at 253. Waucaush pled guilty to conspiring to violate RICO but later moved to vacate his plea. Id. In addressing the jurisdictional reach of § 1962(d), the Sixth Circuit held that "where the enterprise itself did not engage in economic activity," as was true with defendant's gang which only engaged in "violence qua violence," the prosecution had to show a substantial effect on interstate commerce. Id. at 256. The court ultimately found the evidence insufficient to meet this heightened threshold. Id. at 258.

Waucaush is not the law in this Circuit and we have doubts about its validity, particularly in light of Gonzales v. Raich, 545 U.S. 1 (2005), where the Supreme Court more recently reiterated that "when a general regulatory statute bears a substantial relation to commerce, the de minimis character of individual instances arising under that statute is of no consequence." Id. at 17 (citations and internal quotation marks

8

omitted); see also United States v. Nascimento, 491 F.3d 25, 30, 37-39 (1st Cir. 2007) (finding Waucaush incompatible with Gonzales, and concluding "that the normal requirements of the RICO statute apply to defendants involved with enterprises that are engaged only in noneconomic criminal activity"). Nevertheless, even assuming Waucaush is correct and the district court should have followed its holding, it affords Defendants no relief in this case.

The Sixth Circuit's decision to apply an elevated evidentiary burden in Waucaush hinged on the fact that "there [was] no evidence . . . that the [gang] was involved in any sort of economic enterprise." 380 F.3d at 256. Indeed, the court's holding is specifically limited to cases "where the enterprise itself did not engage in economic activity." Id. That is clearly not the case before us. For example, the Government presented ample evidence that the RICO enterprise, the Greensboro Latin Kings, committed multiple acts of bank fraud. In particular, two gang members, Charles Moore and Richard Robinson, devised and executed a false check scheme – Robinson wrote Moore checks on a defunct account at Woodforest Bank, which Robinson then cashed at Wachovia Bank. The proceeds from this scam were then shared with gang leadership. This evidence, standing alone, is sufficient to take this case outside the reach of Waucaush. See United States v. Spinello, 265 F.3d 150,

156 (3d Cir. 2001) ("A bank robber is obviously motivated by his or her own immediate economic gain - money is, of course, 'economic' - and . . . the victim bank and its depositors suffer immediate economic losses as well as the disruption to their respective abilities to engage in commerce, interstate or otherwise, by such activities as lending and purchasing assets."); United States v. Alegria, 192 F.3d 179, 189-90 (1st Cir. 1999) (noting that bank fraud is an "economic" crime); see also United States v. Robinson, 389 F.3d 582, 594 (6th Cir. 2004) (collecting cases identifying banks as channels or instrumentalities of interstate commerce). Accordingly, we conclude that the district court did not err by applying the minimal effects standard in this case.

We further conclude that the trial evidence was more than sufficient to meet this minimal threshold. If the foregoing bank fraud connection to interstate commerce were not enough, the Government also presented testimony that the gang regularly communicated by phone and committed multiple robberies using guns that traveled in interstate commerce. See United States v. Mejia, 545 F.3d 179, 203 (2d Cir. 2008) ("Transporting goods, such as firearms or stolen vehicles, across state lines is a classic example of engaging in interstate commerce."); United States v. Williams, 445 F.3d 724, 732 (4th Cir. 2006) (testimony that the gun used during the commission of the crime was not

10

manufactured in Virginia "established the interstate commerce requirement"); United States v. Atcheson, 94 F.3d 1237, 1243 (9th Cir. 1996) (noting that "placement of out-of-state phone calls" further demonstrated a "connection with interstate commerce"); United States v. Muskovsky, 863 F.2d 1319, 1325 (7th Cir. 1988) (finding interstate nexus based on the use of interstate telephone calls to verify credit card transactions); United States v. Allen, 656 F.2d 964, 964 (4th Cir. 1981) (per curiam) ("[S]upplies used in [defendant's] bookmaking operations which originated outside of Maryland provided a sufficient nexus between the enterprise and interstate commerce to invoke RICO."); see also United States v. Delgado, 401 F.3d 290, 297 (5th Cir. 2005) (finding use of Western Union, telephones, the U.S. Postal Service, and pagers to transfer money and communicate with each other in furtherance of the group's criminal purposes was sufficient to demonstrate that the enterprise affected interstate commerce).

B.

As previously noted, to establish a RICO conspiracy the government must prove "'that each defendant knowingly and willfully agreed that he or some other member of the conspiracy would commit at least two racketeering acts.'" Mouzone, 687 F.3d at 218 (citation omitted). Racketeering acts, often

11

referred to as predicate acts, include any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance chargeable under state law and punishable by imprisonment for more than one year. See 18 U.S.C. § 1961(1).

In charging the jury on this element, the district court instructed that the "verdict must be unanimous as to which type of racketeering acts you have found by your unanimous verdict were committed or intended to be committed by members of the racketeering conspiracy that the defendant has joined." J.A. 4372. The verdict forms (reproduced below) mirrored this instruction, listing multiple types of crimes that satisfy the definition of racketeering acts and asking the jury to decide whether some member of the conspiracy had committed or intended to commit no act, a single act, or multiple acts of each type:

| | No Act | Single Act | Multiple Acts |
|---|---|---|---|
| Conspiracy to Commit Murder | | ✓ | |
| Attempted Murder | | ✓ | |
| Robbery | | | ✓ |
| Extortion | ✓ | | |
| Arson | ✓ | | |
| Narcotics Trafficking | ✓ | | |
| Interference with Commerce by Threats or Violence | | ✓ | ~~✓~~ |
| Bank Fraud | | | ✓ |
| Theft from an Interstate Shipment | ✓ | | |

12

J.A. 4479.

As they did below, Defendants contend this instruction was erroneous. Although Defendants' exact argument on this point is unclear from their brief, we find no error in the district court's charge regardless of how the issue is framed. See Al-Abood ex rel. Al-Abood v. El-Shamari, 217 F.3d 225, 235 (4th Cir. 2000) ("We review de novo the claim that jury instructions fail to correctly state the law.").

To the extent Defendants argue that the district court was required to charge the jury that it had to unanimously agree on the specific racketeering acts that the conspirators engaged in during the conspiracy, such a claim cannot succeed. See Opening Br. 13 ("Absent such an instruction, it is impossible to determine which, if any, of the overt acts the jury unanimously found to be proven beyond a reasonable doubt.").

In Salinas v. United States, the Supreme Court explained that, unlike traditional conspiracy, the RICO conspiracy statute contains "no requirement of some overt act or specific act." 522 U.S. 52, 63 (1997). Instead, a RICO conspiracy may "exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." Id. The partners in the criminal plan need only "agree to pursue the same criminal objective," regardless of whether that criminal objective is ever started or carried out. Id. Thus, to secure

13

a conviction for RICO conspiracy, the government is not required to allege or prove the actual completion of a single racketeering act by the defendant or any other member of the conspiracy. See United States v. Browne, 505 F.3d 1229, 1263–64 (11th Cir. 2007) (noting that RICO conspiracy charges do not require proof of an overt act); United States v. Corrado, 286 F.3d 934, 937 (6th Cir. 2002) ("[Section] 1962(d) requires no 'overt or specific act' in carrying the RICO enterprise forward."). Because completion of an overt act is not an element of the offense, it follows that an instruction, such as that suggested by Defendants, directing the jury to identify what predicate acts actually occurred is not required.

Defendants are likewise unsuccessful if we interpret their argument as contesting the district court's decision to require unanimity as to only the types of racketeering acts the conspirators agreed to commit. See Opening Br. 28 ("Instead of requiring unanimity as to the predicate acts, the district court in this case instead required unanimity only as to the type of acts."). "[A] RICO conspiracy charge need not specify the predicate racketeering acts that the defendant agreed would be committed." United States v. Randall, 661 F.3d 1291, 1297 (10th Cir. 2011). For that reason, every circuit to have considered this issue has concluded that for a RICO conspiracy charge the jury need only be unanimous as to the types of racketeering acts

14

that the defendants agreed to commit.  See United States v. Applins, 637 F.3d 59, 82 (2d Cir. 2011); Randall, 661 F.3d at 1296-99 (collecting cases); see also Third Circuit Manual of Model Jury Instructions – Criminal § 6.18.1962D (2013) ("[Y]our verdict must be unanimous as to which type or types of racketeering activity [defendant] agreed would be committed . . . ."). In agreement with these cases, we conclude that the district court's instruction requiring unanimity as to the types of racketeering acts that members of the conspiracy agreed to commit was sufficient, and no instruction as to the commission of specific acts was required.[2]

## C.

In their final joint claim, Defendants argue that the district court improperly issued two Allen charges, the second of which, they contend, coerced the jury into rendering an unfavorable verdict.  Derived from Allen v. United States, 164 U.S. 492 (1896), the commonly termed Allen charge is a

---

[2] During oral argument, Defendants raised, for the first time, an additional argument that this jury instruction was improper because it failed to conform to the indictment.  Subject to certain exceptions not applicable here, we do not consider on appeal issues raised for the first time at oral argument.  See W. Va. CWP Fund v. Stacy, 671 F.3d 378, 389 (4th Cir. 2011); Goad v. Celotex Corp., 831 F.2d 508, 512 n.12 (4th Cir. 1987). Accordingly, we do not address the merits of this argument and consider it waived.

supplemental instruction given by a trial court when the jury has reached an impasse in its deliberations and is unable to reach a consensus.  See United States v. Seeright, 978 F.2d 842, 845 n.* (4th Cir. 1992).  "[A]n Allen charge must not coerce the jury, and it must be fair, neutral and balanced."  United States v. Cropp, 127 F.3d 354, 359-60 (4th Cir. 1997).  We review a district court's decision to give an Allen charge and the content of such a charge for abuse of discretion.  United States v. Burgos, 55 F.3d 933, 935 (4th Cir. 1995).

The jury deliberated over the course of four days, from Friday, November 16 to Wednesday, November 21.  During this period, the district court gave two modified Allen charges.  The first came at the end of the second day of deliberations on Monday, November 19, and in response to the jury's request to view certain pieces of evidence.  In addressing the evidentiary request, the district court explained the requirement of unanimity and reminded the jury of its "duty to deliberate until you've been able to reach a verdict in this case."  J.A. 4408.  The court further noted that the jury's "only interest is to seek the truth."  J.A. 4409.  No objection was made by Defendants when this charge was given.

The second Allen charge came on Wednesday morning after the jury sent a note indicating that they could not reach a unanimous verdict.  Over Defendants' objections, the district

16

court told the jury that the trial "ha[d] required a certain amount of time, money, and other resources" and "it[] [was] unlikely a jury of twelve men and women could be assembled [for a retrial] who are more conscientious as you have been or impartial as you have exhibited and more competent than the twelve of you." J.A. 4453. The court cautioned that it had no opinion about the case and its instructions were not "intend[ed] to force any of you to abandon clearly held views or convictions." J.A. 4453. Continuing, the court asked jurors in the minority to "listen and carefully consider the views of the majority" and vice versa. J.A. 4453–54. The court concluded by reminding the jury that "at all times . . . no juror is expected to give up a conscientious conviction that he or she may have regarding a defendant's guilt or innocence." J.A. 4454. The jury resumed deliberations, and after approximately three hours, returned a verdict convicting Defendants on the RICO conspiracy charge but acquitting the other three co-defendants. Also, as noted earlier, in completing the verdict sheets for each Defendant, the jury found no predicate acts for RICO purposes in four of the nine categories submitted for their determination.

Defendants do not contest the content of the district court's Allen charges and we agree that such a claim would be meritless. There were no erroneous statements of law by the district court in either charge. See United States v. Hylton,

17

349 F.3d 781, 788 (4th Cir. 2003) (upholding a similarly worded Allen charge). Rather, Defendants argue that the effect of giving the second Allen charge was improperly coercive.

To the extent Defendants suggest that a trial court should at no time give a second Allen charge, we disagree. Our circuit has never adopted a flat ban on multiple Allen charges and we decline to do so now. See Seeright, 978 F.2d at 850 (analyzing a second Allen charge under the traditional abuse of discretion test). The district court "is [often] in the best position to gauge whether a jury is deadlocked or able to proceed further with its deliberations," and thus it is beneficial to evaluate the propriety of a second Allen charge in light of all the circumstances rather than through an arbitrary rule. Id.; see also United States v. Barone, 114 F.3d 1284, 1305 (1st Cir. 1997) (declining to implement a per se ban on multiple Allen charges because "the trial judge is closer to the facts"). Accordingly, we examine the impact of an Allen charge on a case-by-case basis.

The crux of our Allen charge analysis is the likelihood of coercion. The district court acts within its discretion when the charge or charges, taken as a whole and in light of all the circumstances, do not coerce the jurors to abandon their view. See United States v. Martin, 756 F.2d 323, 326 (4th Cir. 1985) ("The danger of the Allen-type charge is the possibility that

18

the minority on the jury may be coerced into going along with the majority."); Burgos, 55 F.3d at 941 ("It is critical that an Allen charge not coerce one side or the other into changing its position for the sake of unanimity."); Cropp, 127 F.3d at 360 ("[W]e do not evaluate a judge's instructions in isolated segments, but we look at the instructions given as a whole.").

In determining whether an Allen charge has an impermissibly coercive effect on jury deliberations, some of the factors we consider include the language of the instruction, its incorporation with other instructions, the timing of the instruction, and the length of the jury's subsequent deliberations. See Jenkins v. United States, 380 U.S. 445, 446 (1965); United States v. Webb, 816 F.2d 1263, 1266 (8th Cir. 1987). These factors are not exclusive, and in the end, the ultimate question is whether the Allen instruction was impermissibly coercive.

Under the circumstances of this case, we conclude there was no coercion as a result of the second Allen charge. First, the jury deliberated for over three hours after the second Allen charge and before returning a verdict. See United States v. Russell, 971 F.2d 1098, 1108 (4th Cir. 1992) ("[T]he fact that the jury deliberated for approximately three hours after hearing the charge provides adequate assurance that the jury was not improperly coerced by the district court's instruction.");

19

United States v. West, 877 F.2d 281, 291 (4th Cir. 1989) (rejecting a similar claim on grounds that the jury deliberated for two hours following the charge). Second, and very tellingly in this case, the jury returned a split verdict. Defendants' claim of coercion is negated by the fact that the jury acquitted three co-defendants and found predicate acts in only five of the nine categories submitted for their consideration. These actions reflect a thoughtful and deliberate jury – not one acting under an impulse of coercion. See United States v. Heath, 970 F.2d 1397, 1406 (5th Cir. 1992) (finding no coercion because the jury's split verdict was "a discriminating one"); West, 877 F.2d at 288 (when the verdict is split, "[i]t can be inferred that the jury carefully considered the evidence against each defendant and based its verdict solely upon that evidence").[3]

In arguing for the opposite conclusion, Defendants rely on United States v. Fossler, 597 F.2d 478 (5th Cir. 1979), which is plainly distinguishable. In Fossler, the Fifth Circuit found the district court's second Allen charge improperly coercive when it was given after "[t]he jury indicated at three separate

---

[3] Defendants suggest that the second Allen charge was impermissible because it was given the day before Thanksgiving. This argument is nothing but pure speculation. We decline to find the charge coercive solely on this fact when all of the relevant evidence indicates the jury's deliberations were unaffected by any improper pressure.

20

points in time, over a three day period, that it could not reach a decision." Id. at 485. And, "[o]nly one hour after the second Allen charge was sent to the jury, a guilty verdict was returned." Id. Given the jury's prior unequivocal deadlock, the Fifth Circuit concluded that the last instruction must have had a coercive effect. Id. There is no comparable evidence of perpetual deadlock in this case sufficient to support a like result. We regularly uphold Allen instructions after the jury first reports impasse, as happened here. See Cropp, 127 F.3d at 360 (affirming where the "district court gave the jurors a lengthy Allen charge after the jurors [first] expressed an inability to reach a consensus"); Hylton, 349 F.3d at 788 (same).

In sum, we are unpersuaded that the jury was coerced into reaching its verdict. After the second Allen charge, the jury deliberated for several more hours and returned a split verdict, indicating they carefully considered the evidence against each defendant. Compare Booth-El v. Nuth, 288 F.3d 571, 580-82 (4th Cir. 2002), with Tucker v. Catoe, 221 F.3d 600, 611 (4th Cir. 2000). On these facts, we find no abuse of discretion in giving the second Allen charge.

III.

Cornell individually raises two issues regarding the trial evidence. First, he challenges the district court's decision to strike the testimony of defense witness Saralee Gallien. Second, he challenges the admission of a letter purportedly written to him by a former gang member. We find no merit in either argument.

A.

At the beginning of trial, the district court granted the Government's motion to sequester witnesses consistent with Federal Rule of Evidence 615. The district court's ruling did not specify any additional limitations on witness contact outside the text of Rule 615, which provides, in relevant part, that "[a]t a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615.

Government witness Charles Moore, a former member of the Latin Kings, testified that in August 2011 he was attacked by a rival gang, and that Cornell orchestrated a drive-by shooting in retaliation. The Government presented this incident as a racketeering act for the conspiracy charge (either as attempted murder or conspiracy to commit murder) and not as an independent crime.

22

To impeach Moore's testimony, Cornell called Saralee Gallien as his witness. She testified that Moore was homeless and briefly lived in her apartment at Cornell's request. While living with her, Moore allegedly discussed his injuries from the August 2011 assault. Gallien testified that Moore had told her the incident was amicably resolved without additional violence.

In cross-examining Gallien, the Government elicited testimony that she made several phone calls to Cornell throughout the course of the trial and had visited him in prison after Moore testified. Gallien admitted discussing the case with Cornell and other supporters, but denied talking about any specific testimony.

After hearing this evidence, the district court concluded that Gallien "more than likely was" aware of Moore's testimony before she was called as a witness. J.A. 4164. The court found her "not to be credible," J.A. 4160, and specifically noted that on at least one occasion she took part in a conversation with Cornell concerning "testimony that has been given in this case," J.A. 4163. The court then struck her testimony in full, "particularly that portion [dealing] with whether or not Mr. Moore made a statement that the [August 2011 incident] was worked out between other parties and was amicable." J.A. 4160.

Cornell first argues that the district court's sequestration order acted only to exclude witnesses from the

23

courtroom.  See United States v. Rhynes, 218 F.3d 310, 316 (4th Cir. 2000) (en banc) (King, J., plurality opinion) (noting that Rule 615 "serves only to exclude witnesses from the courtroom"). Thus, according to Cornell, his discussions with Gallien did not violate the Rule 615 order, and the district court's decision to exclude Gallien's testimony on the basis of a non-existent violation was erroneous.  Cornell separately argues that the district court abused its discretion by excluding Gallien's testimony instead of fashioning a less severe sanction.[4]

We need not address Cornell's arguments on the merits because, even assuming the district court erred by excluding Gallien's testimony, any error was harmless.  See United States v. Smith, 441 F.3d 254, 263 (4th Cir. 2006) ("Exclusion of a witness' testimony is 'an extreme remedy' that 'impinges upon the [constitutional] right to present a defense,' and thus should be used sparingly." (citation omitted)).  "For this constitutional error to be harmless, the Government is required to establish, to the satisfaction of this Court beyond a reasonable doubt, 'that a rational jury would have found the defendant guilty absent the error.'" Rhynes, 218 F.3d at 323

_____

[4] A district court has three options for addressing a Rule 615 violation: it can sanction the witness for contempt; ensure that the jury is aware of the violation through cross-examination or instructions; or exclude all or part of the witness' testimony. See Cropp, 127 F.3d at 363.

24

(citation omitted). The Government has met that burden in this case.

Gallien's testimony concerned only the August 2011 drive-by shooting, which was presented to the jury as a racketeering act for the RICO conspiracy charge and not as a stand-alone crime. Accordingly, even had the jury believed Gallien's testimony, it would have, at most, declined to identify attempted murder or conspiracy to commit murder as a predicate act on the verdict form. Excluding the murder references from the list, the jury still found Defendants' conspiracy included at least five other racketeering acts (such as bank fraud) unrelated to the drive-by shooting. Thus, we do not hesitate to conclude that the jury would have convicted Cornell regardless of Gallien's testimony. See United States v. John-Baptiste, 747 F.3d 186, 207-08 (3d Cir. 2014) (explaining that a "RICO conviction must stand so long as there is sufficient evidence to prove that the defendant committed two or more predicate acts"); see also Callanan v. United States, 881 F.2d 229, 234-35 (6th Cir. 1989).


B.

Cornell's second argument is that the district court erred in admitting into evidence against him a handwritten letter found in the common area of his home. Addressed from "Squrl" to "Jay," the letter warned Jay that federal authorities were

25

investigating him and they had contacted possible cooperating witnesses. The letter also acknowledged "bad blood" between the two men. J.A. 3941.1. To authenticate this document, the Government offered testimony that former gang member Jason Yates and Cornell used the aliases "King Squirrel" and "King Jay," respectively, and that Yates had previously come into conflict with Cornell in gang politics. The Government also disclosed that authorities had approached Yates about cooperating in this case, and thus he knew of the investigation.

The district court admitted the letter over Cornell's objection. He argues this decision was error because the Government offered insufficient evidence to authenticate the letter as admissible evidence. We disagree.

"We review for abuse of discretion a district court's ruling concerning the admissibility of evidence." United States v. McFadden, 753 F.3d 432, 442 (4th Cir. 2014). "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). "'[T]he burden to authenticate under Rule 901 is not high – only a prima facie showing is required,' and a 'district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably

26

find that the evidence is authentic.'" United States v. Hassan, 742 F.3d 104, 133 (4th Cir. 2014) (quoting United States v. Vidacak, 553 F.3d 344, 349 (4th Cir. 2009)).

The letter purports to be two things: a correspondence written by Yates and received by Cornell. As to the former, the Government presented lay testimony that the letter was in Yates' handwriting. Contrary to Cornell's suggestion otherwise, this type of evidence is sufficient to support a finding that Yates was the author. See Fed. R. Evid. 901(b)(2); United States v. Dozie, 27 F.3d 95, 98 (4th Cir. 1994) ("[E]xpert opinion on handwriting is not necessary.").

The Government presented similar evidence to verify Cornell as the recipient. The testimony established that Cornell used the alias "King Jay," and the letter was found in his home after his arrest. The letter also accurately described the antagonistic history between Cornell and Yates. Such evidence is more than sufficient to show that Cornell was the intended and actual recipient. See United States v. Reilly, 33 F.3d 1396, 1404 (3d Cir. 1994) (noting that the connection between a letter and its intended recipient or source can be established by circumstantial evidence, including its contents).

Moreover, even assuming the district court improperly admitted the letter, any error was harmless. We can think of no scenario in which this letter could have improperly swayed the

27

jury. No less than ten cooperating witnesses identified Cornell as the head of the Greensboro tribe, and the letter was introduced primarily to connect other defendants to the conspiracy. See United States v. McMillon, 14 F.3d 948, 955 (4th Cir. 1994) (finding the admission of improper testimony to be harmless error because evidence of the defendant's guilt was "overwhelming").

IV.

Wilson also separately raises two claims of error. He first argues that the evidence was insufficient to find that he joined the alleged RICO conspiracy. Second, he challenges the sufficiency of the evidence supporting a portion of the jury's verdict. We address these contentions in turn.

A.

A defendant challenging the sufficiency of the evidence "bears 'a heavy burden.'" United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (citation omitted). We will uphold a defendant's conviction if, "viewing the evidence in the light most favorable to the government, there is substantial evidence in the record to support the verdict." McFadden, 753 F.3d at 444. "[I]n the context of a criminal action, substantial evidence is evidence that a reasonable finder of fact could

28

accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc).

To sustain a RICO conspiracy charge, the government must prove that the defendant "'knowingly and intentionally agreed . . . to conduct or participate in the affairs of the enterprise.'" Mouzone, 687 F.3d at 218 (citation omitted). Wilson argues, as he did below, that the evidence connecting him to the alleged enterprise in this case, i.e., the Latin Kings, was insufficient. He points out that he never joined the gang and his activities were confined to a few robberies done for his personal benefit. According to Wilson, these facts show "mere association" with the enterprise and not an intentional agreement to participate in its affairs. Opening Br. 39.

We have little trouble concluding that the Government has met its burden on the sufficiency of the evidence. See United States v. Brooks, 957 F.2d 1138, 1147 (4th Cir. 1992) ("Once it has been shown that a conspiracy exists, the evidence need only establish a slight connection between the defendant and the conspiracy to support conviction."). The evidence at trial included testimony that Wilson participated in at least five armed robberies with Latin King members. He was present at the meetings planning the robberies and present when the proceeds were split with gang leaders. From these facts, the jury could

29

infer that Wilson understood the robberies to constitute Latin King activities, and that by joining in them, he agreed to advance the enterprise. Under our precedent, nothing more is required. See Mouzone, 687 F.3d at 218 ("[A] defendant can conspire to violate RICO . . . [by] simply agreeing to advance a RICO undertaking[.]"); see also Salinas, 522 U.S. at 65 ("[I]t suffices that [the conspirator] adopt the goal of furthering or facilitating the criminal endeavor."); Muskovsky, 863 F.2d at 1324 ("[T]he government must show [only] that the defendant 'was aware of the essential nature and scope of the enterprise and intended to participate in it.'" (citation omitted)).

Although Wilson is correct "that the RICO conspiracy statute does not 'criminalize mere association with an enterprise,'" Mouzone, 687 F.3d at 218 (citation omitted), the evidence in this case illustrates far more than his "mere association" with the Latin Kings. When construed in the Government's favor, the record shows that Wilson directly participated in several racketeering acts underlying the alleged conspiracy. Wilson has pointed to no authority suggesting that a defendant with this level of participation in the activities of the RICO enterprise can be considered a mere associate.

Finally, to the extent Wilson suggests that the Government could not prove its case because he never officially joined the Latin Kings, he is mistaken. Outsiders who help the enterprise

30

accomplish its illicit goals, thereby evidencing their agreement to advance the cause, are fully liable under § 1962(d). See Brouwer v. Raffensperger, Hughes & Co., 199 F.3d 961, 967 (7th Cir. 2000) ("One must knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner."); see also Salinas, 522 U.S. at 64 (remarking that under general conspiracy principles, "supporters are as guilty as the perpetrators"). Accordingly, we reject Wilson's sufficiency challenge.

B.

In his final argument, Wilson claims that a portion of the jury verdict is inconsistent with the evidence. According to Wilson, "[t]he [j]ury convicted [him] of predicate acts dating as late as August 2011," although "[n]o evidence indicated that [he] remained in North Carolina after May of 2007." Opening Br. 45. We find this claim lacks merit.

The special verdict sheet in this case consisted of two parts. The district court first instructed the jury to answer Question 1(a), which asked whether they unanimously found the identified defendant guilty of violating § 1962(d). Only if the jury answered yes to Question 1(a), did it move on to Question 1(b). Under Question 1(b), the court instructed the jury to indicate the type or types of racketeering acts that it

31

unanimously found were committed or intended to be committed by some member of the conspiracy that the defendant had joined. Wilson's argument is directed at this latter part.

In answering Question 1(b) as to Wilson, the jury identified a series of racketeering acts separate from the robberies in which he was directly involved. Wilson argues that this was fatal to his conviction because a majority of those racketeering acts occurred after he left North Carolina and was no longer in contact with his co-conspirators. Thus, Wilson concludes, "the court should have dismissed these acts." Opening Br. 45. This argument is a nonstarter. "[A] defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence,' and he becomes responsible for the acts of his co-conspirators in pursuit of their common plot." Smith v. United States, 133 S. Ct. 714, 719 (2013) (alteration in original) (citations omitted). "Once it is proven that a defendant was a member of the conspiracy, the 'defendant's membership in the conspiracy is presumed to continue until he withdraws from the conspiracy by affirmative action.'" United States v. Bennett, 984 F.2d 597, 609 (4th Cir. 1993) (citation omitted). Wilson did not raise a withdrawal defense and never requested such a jury instruction. The jury, therefore, properly considered evidence related to the

conspiracy up to its conclusion in determining its verdict as to Wilson.

V.

For the reasons set out above, the judgment of the district court is

AFFIRMED.

33